# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **GINA CLIFTON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **No. 11 C 1141** |
| | ) |
| **MICHAEL J. ASTRUE, Commissioner** | ) **Magistrate Judge Jeffrey Cole** |
| **of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Gina M. Clifton seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"). 42 U.S.C. §§ 423(d)(2); 1314(a)(3) (A), 216(I) and 223(d)(2). Ms. Clifton asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

Ms. Clifton applied for DIB and SSI on April 30, 2007, alleging she had been disabled since December 31, 1996. (Administrative Record ("R.") 12). The claim was initially denied on August 24, 2007, and upon reconsideration on December 13, 2007. Ms. Clifton filed a timely request for rehearing on March 6, 2008. (R. 125). An administrative law judge ("ALJ") convened a hearing on December 1, 2008 (R. 12), at which Ms. Clifton, represented by council, appeared and testified, along with her mother Patricia Castaldo. (R. 12). Julie L. Bose testified as a vocational expert ("VE"). (R. 12). Ellen Rozenfeld, Psy.D., testified as a medical expert ("ME"). (R. 12). On April 29, 2009, the ALJ issued a decision denying Ms. Clifton's applications because she found that while Ms. Clifton may have some behavioral issues, the functional capacity assessment reflects that she

is able to perform simple routine work as long as no more than one-third of her time is spent in contact with supervisors, co-workers, or the public. (R. 22-27). This became the final decision of the Commissioner when the Appeals Council denied Ms. Clifton's request for a review of the decision on January 5, 2011. (R. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981. Ms. Clifton has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and on May 4, 2011, the parties consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 636(c).

# I
# THE EVIDENCE

## A.
## The Vocational Evidence

Ms. Clifton was born on June 3, 1986, making her twenty-two years old at the time of the ALJ's decision. (R. 175). She did not graduate from high school and has had few jobs. (R. 38-41). She was a greeter at an International House of Pancakes ("IHOP") restaurant for three days (R. 39), worked at a relative's roller skating rink (R. 39), worked at a child day care center, and worked for the Rainbow Push Coalition (R. 40). These jobs all ended either because Ms. Clifton was let go or because she quit after a short period of time (R. 38-41). Ms. Clifton says she cannot hold a job because she "can't get along with people" and "it takes [her] a while to finish a task . . . ." (R. 41). According to Ms. Clifton, she is unable to work because of psychological problems including depression and personality disorder. (R. 41-43).

## B.

## The Medical Evidence

The medical record begins on February 28, 2007, and therefore is silent on the patient's mental state or abilities prior to that date. At that time, Ms. Clifton was referred by her caseworker to Dr. Morris Blount at the Community Mental Health Council in Chicago, IL.  Dr. Blount filled out the Adult Community Health Assessment showing Ms. Clifton came in with the following symptoms: crying, feelings of isolation and hopelessness, being worried all the time, and the inability to complete daily tasks due to low energy. (R. 285). Additionally, Dr. Blount checked the boxes for anxiety, agitation, and irritation, all with a frequency of occurrence five to seven days a week. (R. 285). Dr. Blount indicated she did not complain of having auditory or visual hallucinations and he listed her current level of functionality as performing household chores, cooking, and cleaning. (R. 285).

On March 27, 2007, Dr. Blount performed a psychiatric evaluation on Ms. Clifton in which he noted that she was "awake, alert and oriented x 3. She is calm, cooperative with coherent speech." (R. 284). He also noted that she denied having audio or visual hallucinations and that her mood was "Okay Affect slightly restricted." (R. 284). Dr. Blount diagnosed her with "major depression," noted a Global Assessment of Functioning ("GAF") score of 60, and prescribed Lexapro and Trazodon to deal with the depression. (R. 284). Subsequent visits on April 24, May 22, June 19, and July 17, 2007, resulted in various adjustments to her medications. (R. 280-83). For example, adjustments were made during the April 24, 2007, appointment where Dr. Blount wrote that Ms. Clifton "could not tolerate the Lexapro, for she had severe GI [gastrointestinal] side effects" but also stated "her mood is improving a little." (R. 283). At each of these sessions Dr. Blount's assessment stated, "The patient is awake, alert, and oriented x 3. She is calm, cooperative with coherent speech. Mood

'Okay' Affect is congruent with mood . . . ." (R. 280-83).

During the August 14, 2007 session, Ms. Clifton began to show signs of improvement. Dr. Blount stated, "She does not have as many mood swings, is able to control her anger." (R. 279). On September 11, 2007, he wrote, "She is not having the mood swings, is not feeling as depressed." (R. 278). On November 13, 2007, Dr. Blount wrote, "[Ms. Clifton] is relatively stable." (R. 277). At a visit on January 22, 2008, Dr. Blount reported that Ms. Clifton believed she was pregnant and stopped taking her meds. (R. 276). He reported that, "She is a bit agitated at this time." (R. 276). At a February 1, 2008 follow up session Ms. Clifton reported that relatives had told her she was "mean" but he wrote that she had "recently resumed her meds." (R. 275). The final three reports in the medical record show that her mental state began to improve again. For example, on March 28, 2008, Dr. Blount reported that, "She is sleeping well at night, is not feeling depressed." (R. 274). Notes on her May 2, 2008 session indicated, "She is not having the mood swings." (R. 273). The final documented visit on May 30, 2008, reported that Ms. Clifton "is not feeling depressed, is not having mood swings" and that she "wants to go back to school . . . ." (R. 298). At each session Dr. Blount reported that, "The patient is awake, alert and oriented x 3. She is calm, cooperative with coherent speech. Mood 'Okay' Affect is congruent with mood . . . ." Ms. Clifton denied audio or visual hallucinations. (R. 273-79, 298). The May 30, 2008 report also included a handwritten note dated July 25, 2008 (the date of last visit) indicating that Ms. Clifton had decided to terminate the session and she would not be returning for treatment. (R. 298). The note also stated that she did not receive a refill of her medications. (R. 298).

On July 25, 2008, Dr. Blount completed a Mental Residual Functional Capacity ("MRFC")

4

assessment in connection with the disability claim. On page three, where Dr. Blount was asked to identify signs and symptoms associated with the diagnosis, he checked the following boxes: Appetite disturbance with weight change, Sleep disturbance, Mood disturbance, Delusions or hallucinations, Anhedonia or pervasive loss of interests, Difficulty thinking or concentrating, Suicidal ideation or attempts, and Blunt, flat, or inappropriate affect. (R. 290). He also noted that her GAF score was 50 and that was the highest level recorded in the previous year.

On page two, Dr. Blount checked a box indicating that as a result of Ms. Clifton's impairment she would be expected to be absent about three days a month from work. (R. 291). On page three, Dr. Blount was asked to rate Ms. Clifton's mental abilities and aptitude to perform unskilled work. (R. 292). For each of sixteen categories including the ability to understand and remember very short and simple instructions and the ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, Dr. Blount rated her ability as "fair." (R. 292). On the form, "Fair" is defined as "Ability to function in this area is not precluded but seriously limited." (R. 292). On page four, when Dr. Blount was asked to indicate the degree of functional limitations as a result of mental impairments, he noted: moderate limitations in activities of daily living, marked limitations in difficulties maintaining social functioning, frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner (in work settings or elsewhere), and three or more episodes of deterioration or decompensation in work or work-like settings. (R. 293).

On October 21, 2008, Ms. Clifton began seeing Dr. Piyush C. Buch. The medical evidence in the record from her new doctor includes the following forms all dated October 21, 2008: a medical history form, a self-reported mood disorders rating form, and an initial assessment. (R. 312-

14). On the medical history form, Ms. Clifton indicates her reason for the visit to be depression and bipolar disorder. (R. 314). There is one additional self-reported form dated November 18, 2008, in which Dr. Buch notes she does not have suicidal ideation. (R. 311).

On July 13, 2007, Dr. Ana A. Gil performed a Mental Status Evaluation in connection to the disability claim. Ms. Clifton told Dr. Gil that she was being treated by Dr. Blount for major depression and had been seeing him about once a week for the past four months. (R. 238). Ms. Clifton reported that the medication she received from Dr. Blount was helping her but that when she becomes very anxious she starts "cutting herself." (R. 238). She claimed this behavior was consistent throughout her lifetime. (R. 238). Ms. Clifton also reported that she last worked about a year prior for three days at IHOP but was fired when she got into a fight with a co-worker. (R. 238).

After completing the evaluation, Dr. Gil reported that she had mild psychomotor agitation, a sad and tearful affect and a moderately depressed mood. (R. 241). After performing several tests, Dr. Gil noted that Ms. Clifton's memory was good, she was able to perform mathematical calculations, her judgment was fine, and she was able to distinguish similarities and differences in a series of hypothetical situations. (R. 240-41). She thus believed that Ms. Clifton's mental state was intact. (R. 240-41). Ms. Clifton expressed feelings of helplessness, hopelessness, low self-esteem, and passive suicidal ideation. (R. 241). The diagnosis was: 1. Major depression single episode without psychotic features – moderate in severity. 2. Personality disorder, NOS with borderline and antisocial personality traits. 3. Childhood history of reading and arithmetic learning disability. 4. Childhood history of a conduct disorder and being in special education classes for children with emotional and behavioral disorders. (R. 241). Finally, Dr. Gil noted that there was no evidence of psychosis or thought process disorder during the Mental Status examination. (R. 241).

On August 20, 2008, in connection with Ms. Clifton's disability claim, State Agency medical consultant, Dr. Donald Henson, Ph.D., reviewed the record. Dr. Henson based his medical disposition on an analysis of the following categories: 12.02 Organic Mental Disorders, 12.04 Affective Disorders, and 12.08 Personality Disorders. (R. 252). Dr. Henson performed his own "B criteria" rating and concluded that Ms. Clifton had moderate limitations in restriction of activities of daily living, moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace and did not comment on episodes of decompensation. (R. 262).

He also conducted his own MRFC assessment based on the medical evidence and concluded that Ms. Clifton was not markedly limited in any categories, but was moderately limited in the following: the ability to carry out detailed instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public. (R. 266-67). On page three he gave his opinion in the functional capacity assessment where he reported "[S]he possesses sufficient cognitive, attentional, and functional abilities to perform simple routine activities which have few social demands." (R. 268).

## C.
## The Administrative Hearing Testimony

## 1.
## Ms. Clifton's Testimony

At the hearing, Ms. Clifton testified that she currently lives with her mother and five-year-old daughter. (R. 33). Regarding daily activities other than work, Ms. Clifton testified that she does not know how to drive, but is independent enough to take the bus by herself with "a little bit of help." (R. 33-34). She is able to go to the grocery store with her mother and also can cook for her mother and daughter. (R. 35-36). Additionally, she is capable of doing work around the house (vacuuming, doing the dishes, and hanging up clothes). (R. 36-37). She testified that she does have friends whom she visits with both at her home and outside her home a few times per month. (R. 37-38).

Ms. Clifton testified that her psychological problems began in the sixth grade where she was in special education classes because of a learning disability and Emotional Behavior Disorder. (R. 49-50). It was because of these issues that she stopped attending high school in the ninth grade. (R. 38). Ms. Clifton testified that she was "kicked out" of high school because she stopped attending, saying, "it was hard and I didn't like the people there." (R. 38). Ms. Clifton stated that these recurring issues prevented her from holding down employment. She worked briefly at her aunt's roller-skating rink, but stopped because she "get[s] into altercations with people." (R. 39). She also worked as a greeter at an IHOP restaurant for three days before being fired for having a "confrontation with the boss." (R. 40).  Next, she worked at a childcare center but quit because "[she] wasn't going to change somebody else's kid's diaper." (R. 40). This was followed by a job working at Rainbow Push where she quit after she "got into it" with her boss. (R. 41).

When asked why she no longer sees Dr. Blount, Ms. Clifton stated that they had an altercation when she brought him the MRFC to fill out at their last appointment on July 25, 2008. (R. 55). Ms. Clifton stated that he filled out the MRFC and then began to discuss her employment situation. (R. 57-58). According to Ms. Clifton, she took offense to a line of questioning from Dr. Blount about taking care of her daughter financially. (R. 55). Ms. Clifton also stated "some of the stuff [Dr. Blount] wrote in that report is not true." (R. 98). For example, Dr. Blount stated that Ms. Clifton told him "that the medication wasn't working" and in his report he stated that she said it was working. (R. 98). When asked why he would write that in the report if it wasn't true, Ms. Clifton stated, "he told me point blank . . . he didn't think that I should get SSI . . . ." (R. 98). *See* discussion *infra* at 19.

## 2.
### Patricia Castaldo's Testimony

Patricia Castaldo (Ms. Clifton's mother) testified that Ms. Clifton has had psychological problems since she was young. (R. 64). When asked why Ms. Clifton cannot work outside the home, Ms. Castaldo said that her daughter "doesn't get along with people" and she has outbursts. For example, Ms. Castaldo testified that her daughter used to attend church with her until she had an argument with another person and "[Ms. Clifton] blew off the handle . . . she started cussing the person out[.]" (R. 65). Ms. Castaldo testified that in addition to profanity her outbursts often result in threats, but Ms. Clifton is never violent with others; however, she does engage in cutting behavior. (R. 65). Ms. Castaldo said that when Ms. Clifton is taking her medication it helps her but makes her sleep (R. 65, 76). When asked about her daughter's relationship with Dr. Blount, Ms. Castaldo indicated that she did not believe he was very helpful to her daughter and stated that all he

did was give her drugs. (R. 85). She also indicated that Dr. Blount did not recommend that her daughter seek out counseling. (R. 84).

With respect to daily activities, Ms. Castaldo testified that Ms. Clifton helps with chores around the house, but only after being asked to do so. (R. 68). She indicated that Ms. Clifton takes care of her daughter by herself and is solely responsible for her welfare while she is at work from approximately 2:45 PM to 12:30 AM. (R. 69-72). Ms. Castaldo further testified that Ms. Clifton rarely leaves the house and that she also cuts her arms (R. 75). Ms. Clifton only has one friend her mother can recall whom she sees every two or three months. (R. 72-73). She has been living with her mother for about two years and prior to that was homeless for a short time. (R. 80). Ms. Castaldo also indicated that her daughter briefly lived on her own with an ex-boyfriend (R. 78-79), but because of constant fighting she came back to live with her. (R. 80). She further testified that Ms. Clifton dropped out of school and quit her job at the roller skating rink because she became pregnant. (R. 83-84). Regarding other social activities, Ms. Castaldo testified that Ms. Clifton has had between five and seven boyfriends since her daughter was born and sometimes goes off for the weekends with them. (R. 79-82).

### 3.
### The Medical Expert's Testimony

Dr. Ellen Rozenfeld, the ME, testified that she had reviewed the medical evidence and was asked to identify Ms. Clifton's impairments. (R. 87). Dr. Rozenfeld testified that according to the medical records of Drs. Blount, Gil, and Henson, Ms. Clifton had consistently been diagnosed with major depression. (R. 87-88). Next, Dr. Rozenfeld focused on the inconsistencies in the medical record. (R. 87-88). She pointed out that both Drs. Blount and Gil diagnosed the claimant with major

depression; however, Dr. Blount indicated in his MRFC that it was with psychotic features, and Dr. Gil noted there were no psychotic features. (R. 87-88). On this point, Dr. Rozenfeld noted that prior to the July 25, 2008 report, Dr. Blount consistently indicated in his treatment notes that the claimant denied any audio or visual hallucinations. (R. 88). Dr. Rozenfeld therefore concluded that there was no medical evidence to support a finding of psychotic process. (R. 88).

In discussing the findings of Dr. Gil, Dr. Rozenfeld noted that the claimant's mental status was reported as intact even though Ms. Clifton reported daily crying, feelings of worthlessness, and social isolation. (R. 90). Dr. Rozenfeld also noted that Ms. Clifton had the capacity to travel on her own, pay bills, perform household chores, and care for her young child. (R. 90). In support of these findings, Dr. Rozenfeld noted that Dr. Gil found that Ms. Clifton's memory was good, she was able to perform mathematical calculations, her judgment was fine, and she was able to distinguish similarities and differences. (R. 90). Dr. Rozenfeld ultimately concluded that "with the exception of some mood issues" Ms. Clifton had an intact mental state. (R. 90).

Dr. Rozenfeld's also gave an opinion on the medical records provided by Dr. Blount, noting, for example, the inconsistency between the initial diagnosis of major depression and a GAF of 60 in March 2008 and his final assessment on July 25, 2008, showing a GAF of 50. (R. 91).[1] She then indicated that Dr. Blount's treatment notes spanned the period March 2007 to May 2008. (R. 91).

---

[1] A GAF score reports the clinician's assessment of the patient's overall level of functioning, and a range of 51-60 indicates mild symptoms or some difficulty in functioning, but generally functioning pretty well. *Campbell v. Astrue*, 627 F.3d 299, 301 (7th Cir.2010) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders (DSMV-IV-TR)* 34 (4th ed. 2000)). And a range of 41-50 reflects serious symptoms or a "serious impairment in social, occupational, or school functioning." *Belvins v. Astrue*, 451 Fed.Appx. 583, 584 (7th Cir.2011) (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders (DSMV-IV-TR)* 34 (4th ed. 2000)).

Dr. Rozenfeld noted that Ms. Clifton had a favorable response to her medications after they were adjusted in July 2007. (R. 93). She was not having any mood swings, was able to control her anger, but was having some secondary insomnia. (R. 93). Ms. Clifton had consistently taken her medications until she believed she was pregnant. (R. 91). While off of her medications there was an increase in her symptoms, but after getting back on the medication she began to improve. (R. 96).

Discussing Dr. Blount's MRFC assessment on July 25, 2008, Dr. Rozenfeld noted that the record showed that Ms. Clifton had fair mental ability for all work related functions. (R. 94). However, when assessing the "B criteria" Dr. Blount recorded that she had marked limitations with social functioning, concentration, persistence, and pace. In addition, Dr. Blount recorded repeated episodes of decompensation. (R. 94). However, Dr. Rozenfeld also indicated that this was inconsistent with the treatment notes provided by Dr. Blount from March 2007 to May 2008. (R. 94). Dr. Rozenfeld's opinion, based on the record, was that Ms. Clifton had moderate limitations in social functioning; concentration, persistence, and pace; and no episodes of decompensation. (R. 97). She also questioned the consistency of the "B criteria" as compared to the work related functioning assessment stating, "If someone would have marked limitations in three of the four "B criteria," you would expect poor to no residual functional capacity [as opposed to fair residual functional capacity] vis-à-vis work related functions . . . . " (R. 94).

Dr. Rozenfeld thus concluded that the medical record did not support the "B criteria" assessment by Dr. Blount. (R. 95). In her opinion, there was nothing in the record to support the inability of Ms. Clifton to perform "simple, routine tasks in an environment where there is only

occasional[2] contact with the general public, co[-]workers, [and] supervisors." (R. 95). Dr. Rozenfeld testified that Ms. Clifton should not work in an environment where the completion of tasks would require "cooperative contact," but could work in proximity with others. (R. 99). With respect to supervisors, she would be able to function where "someone would come and check on her on a periodic basis" but not constant supervision. (R. 100). She further testified that contact with a supervisor, the public, or co-workers should be limited to one-third of the day. (R. 101).

### 4.
### The Vocational Expert's Testimony

Julie Bose, the VE, testified that there are jobs in the Chicago and the six Collar County area suitable for Ms. Clifton. (R. 103). Allowing for the requirement of simple routine tasks with less than one-third of the day interacting with others, Ms. Bose testified that she could perform medium range work. For example, she could perform work as a cleaner 2 – a position that typically cleans office buildings at night. (R. 103). She testified that there were approximately 3,400 to 3,600 jobs of this type in the area. Additionally, she included work as a housekeeper or a stock person for which there are approximately 2,200 to 2,400 and 1,600 to 1,800 jobs, respectively. When limiting the scope of the inquiry to jobs that only require ten to twenty pounds of lifting due to Ms. Clifton's weight, Ms. Bose indicated that there would be fewer positions, including laundry folding and automated machine operators with between 800-1,800 positions in the area.

---

[2] According to the Social Security Administration "occasional" means "from very little to up to one-third of the time." SSR 83-14.

## II.
## The ALJ's Decision

The ALJ found Ms. Clifton to have the following severe impairments: major depressive disorder without psychotic features; a childhood history of learning disorder, as reported by the claimant; and a childhood history of conduct disorder, as reported by the claimant. (20 CFR 416.921); (R. 22). Next, the ALJ found that Ms. Clifton's impairments failed to meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926). (R.23). The ALJ focused on 12.02 Organic Mental Disorders, 12.04 Affective Disorders and 12.08 Personality Disorders stating that the claimant's mental impairments considered singly and in combination do not meet these criteria. (R. 23).

When considering the "paragraph B" criteria, the ALJ noted that in order to be satisfied the impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistent, or pace; or repeated episodes of decompensation, each of extended duration. Marked limitations mean more than moderate but less than extreme. (R. 23). Repeated episodes of decompensation, each of extended duration, means three episodes within a year, or an average of once every four months, each lasting for at least two weeks. (R. 23). The ALJ found that based on the medical record, Ms. Clifton did not satisfy any of the criteria and therefore the "paragraph B" criteria were not satisfied. (R. 23).

The ALJ further found that Ms. Clifton has the residual functional capacity to perform a full range of work at all exertional levels with the following limitations: simple, routine tasks limited interaction with supervisors and co-workers (one-third of the day maximum), can work in close

proximity to the public but cannot interact with the public by providing information directly. (R. 24). The ALJ noted Dr. Gil's mental status evaluation and testimony showing that she engages in a wide range of daily activities including cooking, shopping, cleaning, using public transportation, managing bills, and caring for her child. (R. 24). The ALJ also gave considerable weight to Dr. Blount's medical treatment records showing that although Ms. Clifton has some issues with anger and depression, when given proper medications they were controlled. (R. 25).

The ALJ questioned Ms. Clifton's credibility, concluding that she overstated her symptoms in an attempt to obtain disability benefits. (R. 25). As an example, the ALJ noted that Ms. Clifton testified that she lost her job at the roller skating rink because of behavioral problems, but her mother testified it was because she was pregnant. (R. 25). Additionally, Ms. Clifton stated she was kicked out of school due to truancy, but her mother indicated it was at least in part due to her pregnancy. (R. 25). Further, her reports to doctors were inconsistent. For example, Dr. Buch reported that she was bipolar, based entirely on the claimant's self-reporting, while none of the other doctors reported this impairment. (R. 25). The ALJ therefore concluded that while the medically determinable impairments could be expected to cause the alleged symptoms, Ms. Clifton's statements regarding severity and limiting effect were not credible. (R. 25).

The ALJ ultimately gave little weight to the opinion of Dr. Blount that Ms. Clifton had marked limitations in social functioning, frequent deficiencies of concentration, persistence, pace and repeated episodes of deterioration or decompensation. (R. 25). The primary reason given for this conclusion is that the opinion was inconsistent with Ms. Clifton's reported symptoms and Dr. Blount's treatment notes from March 2007 to May 2008. (R.25). Dr. Blount's initial GAF score on March 27, 2008, was 60 while the final GAF given on July 25, 2008, went down to 50, even though

the treatment notes show Ms. Clifton was improving. (R. 25).

In addition, the ALJ noted that the form filled out by Dr. Blount was similar to the "B criteria" put out by the Social Security Administration but it was actually quite different. (R. 25-26). For example, Dr. Blount's form considers an episode of deterioration or decompensation as causing, in a work or work-like setting, an individual to withdraw from that situation or experience exacerbations of signs and symptoms. (R. 25). In contrast, the Social Security Administration defines repeated episodes of decompensation as: each (decompensation) of extended duration, means three episodes within one year, or an average of once every four months, each lasting for at least two weeks. (R. 25-26). Thus, in addition to inconsistencies between his treatment notes and MRFC form, there is also the issue of comparing Dr. Blount's apples to the Social Security's oranges. (R. 26). Dr. Blount cannot redefine a term that the Social Security Administration has defined differently and substitute his redefined term. Finally, the ALJ noted that Ms. Clifton testified that Dr. Blount told her he did not believe she was disabled or entitled to SSI. (R. 26). Obviously, crediting that statement casts the most serious doubt imaginable on Dr. Blount's credibility.

Based on the VE's testimony, the ALJ found that there are jobs in significant numbers in the national economy that Ms. Clifton could perform. (20 CFR 416.969, 464.969(a)) (R. 26). The ALJ then repeated the findings of the VE, noting that Ms. Clifton could perform work at the medium exertional level as a cleaner 2 (housekeeper, stock clerk) for which there are 3,400-3,600 positions in the Chicago and six collar counties. (R. 27). Even at the light exertional level there would be 2,800-3,000 jobs available. (R. 27). Therefore, the ALJ found that "considering the claimant's age, education, work experience, and residual functioning capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy."

(R. 27). The ALJ found that the classification of "not disabled" was appropriate under the framework of section 204.00 in the Medical-Vocational guidelines and Ms. Clifton has not been under disability, as defined in the Social Security Act, since April 30, 2007 (date of the application). (R. 27).

## III.
## ANALYSIS

### A.
### The Standards Of Review

We review the ALJ's decision directly, but we do so deferentially, *Weatherbee v. Astrue*, 649 F.3d 565, 568–69 (7th Cir.2011), and we play an "extremely limited" role. *Similia v. Astrue*, 573 F.3d 503, 513-14 (7th Cir.2009); *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir.2008). "We do not actually review whether [the claimant] is disabled, but whether the Secretary's finding of not disabled is supported by substantial evidence." *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir.1993). *See also Weatherbee*, 649 F.3d at 568–69. 4 If it is, the court must affirm the decision. 42 U.S.C. §§ 405(g). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir.2010).

The court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Weatherbee*, 649 F.3d at 568–69; *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir.2009); *Berger*, 516 F.3d 539, 544 (7th Cir.2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Simila*, 573 F.3d at 513 –14; *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997). Since conclusions of law are not entitled to such deference, where the Commissioner commits an error of law, the court must

reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir.2007). While the standard of review is deferential, the court cannot "rubber stamp" the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

Although the ALJ need not address every piece of evidence, the ALJ cannot limit discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir.1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It is enough if the ALJ "articulate[s] at some minimal level his analysis of the evidence.' " *Id.* at 333–334 (citations omitted). *Accord Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001); *Zurawski v. Halter,* 245 F.3d 881 (7th Cir.2001); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *Ray v. Bowen,* 843 F.2d 998, 1002 (7th Cir.1988)(All that is required is that the ALJ "articulate at some minimum level his analysis of the evidence" so that the court can assess the validity of his findings and provide a meaningful review).   This is a "lax" standard. *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir.2008).

**B.**
**Five–Step Sequential Analysis**

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila*, 573 F.3d at 512–13; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351–52 (7th Cir.2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. § 416.920; *Briscoe*, 425 F.3d at 352. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. § 404.1520; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). The claimant bears the burden of proof through step four; if it is met, the burden shifts at step five to the Commissioner, who must present evidence establishing that the claimant possesses the residual functional capacity to perform work that exists in a significant quantity in the national economy. *Weatherbee*, 649 F.3d at 569–70; *Briscoe*, 425 F.3d at 352.

## C.
### Analysis

Ms. Clifton suffers from a depressive disorder. The issue is the degree to which it limits her ability to work. The evidence in this regard is somewhat inconsistent. Her treating doctor, Dr. Blount, saw her from March 2007 to July 2008. Through May 2008, Dr. Blount's treatment notes indicated that she did not complain of hallucinations or delusions, her mood was "Okay," her anger and depression were controlled when she takes her medication, and she did not have any thoughts of suicide. (R. 273-83, 298).

On the other hand, the MRFC from Dr. Blount's July 25, 2008, appointment with Ms. Clifton indicated that she had hallucinations and delusions, had a mood disturbance, and had suicidal ideations. (R. 290-93). Thus, his medical assessment of Ms. Clifton is internally inconsistent, and it is most assuredly inconsistent with his statement to Ms. Clifton that he did not believe her medical issues entitled her to benefits. (R. 98). This is essentially an opinion by the treating doctor that she is not disabled.

The ME, Dr. Rozenfeld, also testified to this inconsistency, finding that Dr. Blount's treatment notes are not correlated to the findings made for the "B criteria." (R. 95). The state Agency medical consultant, Dr. Henson, reviewed Dr. Blount's treatment notes. He then performed his own "B criteria" assessment that contradicted Dr. Blount's assessment. (R. 262). Dr. Rozenfeld testified that there was nothing in the record to support the inability of Ms. Clifton to perform "simple, routine tasks in an environment where there is only occasional contact with the general public, co[-]workers, [and] supervisors." (R. 95). Similarly, the State Agency consultant, Dr. Henson, reported that "[Ms. Clifton] possesses sufficient cognitive, attentional, and functional abilities to perform simple routine activities which have few social demands." (R. 268).

It cannot be too often repeated or too strongly emphasized that disabilities under the Social Security regulations should not be confused with medical conditions. "A person can be depressed, anxious, and obese yet still perform full-time work." *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).

The ALJ accepted that Ms. Clifton had major depressive disorder without psychotic features; a childhood history of learning disorder, as reported by the claimant; and a childhood history of conduct disorder, as reported by the claimant. However, the ALJ analyzed the evidence and decided

to give greater weight to Dr. Rozenfeld and Dr. Henson's opinions than to Ms. Clifton's treating psychiatrist. The reason given for this was that Drs. Henson and Rozenfeld reviewed the medical record, and their opinions were consistent with the evidence, while Dr. Blount's was not. (R. 26). This is the ALJ's province; the reviewing court is not to reweigh or resolve conflicts in the evidence or substitute its judgment for the ALJ's. *See White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005). *See also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir.2008) (when the treating doctor's opinion is inconsistent with the consulting physician's opinion the ALJ may discount the evidence); F*lynn v. Astrue,* 563 F.Supp.2d 932, 940 (N.D.Ill. 2008)(collecting cases)**.** The reviewing court need not even agree with the ALJ's conclusion. So long as reasonable minds might differ as to whether the claimant is disabled, the ALJ's decision must be upheld. *Schmidt*, 496 F3d. at 842. *See also* discussion *infra* at 23, *et seq.*

Ms. Clifton advances three primary arguments in support of her motion for reversal. First, she argues that the ALJ erred in her evaluation of the medical opinions of Dr. Blount. Specifically, the plaintiff argues that Dr. Blount's treatment notes and MRFC opinion are not necessarily inconsistent, the ALJ incorrectly discredited the form filled out by Dr. Blount, and the ALJ did not afford the proper weight to Dr. Blount's opinion as the treating psychiatrist. Second, Ms. Clifton argues that the ALJ erred in determining her residual functioning capacity under SSR 96-8p by not adequately addressing her psychological limitation in dealing with people, failing to instruct the VE to consider her moderate limitations in concentration, persistence, or pace; and failing to address her obesity. Finally, Ms. Clifton argues that the ALJ erred in evaluating her credibility under SSR 96-7p by using boilerplate language that calls into question the logic of the her evaluation.

**1.**

**Ms. Clifton's Challenges to the ALJ's Conclusions Regarding the Medical Evidence**

Ms. Clifton raises four arguments challenging the ALJ's evaluation of the medical opinions. First, Ms. Clifton argues that the ALJ erred because Dr. Blount's treatment notes and MRFC opinion are not necessarily inconsistent. Second, she contends that to the extent they are inconsistent, the ALJ had a duty to call in the treating doctor for clarification. The third argument advanced is that the ALJ improperly discredited Dr. Blount's opinion on the basis of his assessment of her episodes of decompensation. Finally, Ms. Clifton argues that the ALJ did not give the treating psychiatrist's opinion the proper weight.

First, plaintiff argues that Dr. Blount's treatment notes are not necessarily inconsistent because while he opines in the MRFC that Ms. Clifton has major depressive disorder with psychotic features, his treatment notes do not reference psychotic features at all. (*Memorandum in Support of Plaintiff's Motion for Summary* Judgment, at 8). This argument is feckless. It ignores the doctrine of impeachment by omission. The theory of impeachment by omission is that "'if [a] former statement fails to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement, the prior statement is sufficiently inconsistent' to be admitted to impeach the present testimony." *Moylan v. The Meadow Club, Inc.*, 979 F.2d 1246, 1249 (7th Cir. 1992). It is nonsensical to argue that a doctor's notes that omit any mention of complaints or observations of psychotic features is not inconsistent with the doctor's later opinion that during the time period covered by the notes the patient *was* manifesting psychotic symptoms.

However, Dr. Blount's treatment notes do reference psychotic features and conclude there were none. From March 2007 to May 2008, Dr. Blount reported that Ms. Clifton stated she did not

have any hallucinations or delusions. (R. 273-84, 298). Dr. Gil also reported this on July 13, 2007, in her Mental Status evaluation. (R. 238). In addition to the absence of psychotic features, the ALJ noted that the initial GAF score was 60; however, after over a year of treatment notes showing consistent improvement, Dr. Blount reported on the MRFC that her GAF had fallen to 50. Dr. Blount gives no explanation for this change. Therefore, the example given by the plaintiff as well as other evidence in the record supports the ALJ's conclusion regarding Dr. Blount.

Next, plaintiff argues that to the extent the reports are internally inconsistent, the ALJ had a duty to contact Dr. Blount to resolve the inconsistency. The Seventh Circuit rejected this same argument in *Similia*. While "[a]n ALJ has a duty to flesh out an opinion for which the medical support is not readily discernable," *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir.2004), that does not mean that an ALJ must do so whenever the evidence fails to support a doctor's opinion. *Similia*, 573 F.3d at 516. Rather, ALJ's "may contact treating [doctor's] when the information in the record is 'inadequate.'" Here the evidence was not inadequate; the ALJ simply found that Dr. Blount's treatment notes failed to support his conclusions in the MRFC. (R. 25-26). The regulations entitle the ALJ to make this finding. *Similia*, 573 F3d. at 516-17. Finally, the ALJ noted that Dr. Blount expressed to Ms. Clifton that he did not believe she was entitled to benefits. Crediting that testimony, as she apparently did, made it unnecessary to contact Dr. Blount.

Plaintiff next argues that the ALJ erred in discrediting Dr. Blount's opinion on the basis of his assessment of Ms. Clifton's episodes of decompensation. Essentially, plaintiff argues that while the ALJ was correct that Dr. Blount defined episodes of decompensation more broadly than the Social Security Administration permitted, he accurately recorded episodes of decompensation. In advancing this argument, plaintiff points to Ms. Clifton's three jobs – the IHOP, roller rink, and

daycare center – to show that because she lost these jobs due to her claimed difficulty in relations with others she did have three episodes of decompensation. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 9-10).  Thus, plaintiff argues that Dr. Blount correctly recorded these episodes and Ms. Clifton meets the "paragraph B" criterion.

However, the reasons for her leaving two of these jobs are in dispute. While Ms. Clifton claimed in her testimony she left the roller rink due to altercations (R. 39), her mother testified that it was because she was pregnant. (R. 83-84). Furthermore, Ms. Clifton testified that she was not fired from the day care center, but rather quit because she "wasn't going to change somebody else's kid's diaper." (R. 40). The scheme established by Congress and the Social Security regulations envision that conflicts in the evidence be resolved by the ALJ. The ALJ weighed this evidence (R. 25), and was entitled to come to her own conclusion. *See Similia*, 573 F3d. at 516-17.  Dr. Blount simply took the plaintiff at her word. But that does not mean there were in fact episodes of decompensation.

Finally, Ms. Clifton argues, incorrectly, that, as the treating psychiatrist, Dr. Blount's opinion was at least entitled to "great weight." The Seventh Circuit has " 'disapproved any mechanical rule that the views of a treating [doctor] prevail.'" *Peabody Coal Co. v. McCandless*, 255 F.3d 465, 469 (7th Cir. 2001). The " 'treating [doctor's] views may not be accepted unless there is a good reason to believe that they are accurate.' .... Conversely, when the views of the treating [doctor] are accurate and supported by medical evidence, those views may be accepted." *Zeigler Coal Co. v. Office of Workers' Compensation Programs*, 490 F.3d 609, 616 (7th Cir.2007).

The Seventh Circuit has expressed some puzzlement about the "treating doctor" rule in the somewhat rigid form used by plaintiffs like Mrs. Clifton. "Obviously if the [treating doctor's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which

the administration law judge, who is not a [doctor], could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating [doctor's] evidence is no longer entitled to controlling weight." *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir.2006). At that point, "the treating [doctor's] evidence is just one more piece of evidence for the administrative law judge to weigh." *Id*. at 377.

In deciding how much weight to accord a treating doctor's opinion, the ALJ should consider various factors, such as how often the treating [doctor] examined the claimant, whether the [doctor] is a specialist in the condition claimed to be disabling; consistency with the record; and other relevant factors. *Id*. at 377; 20 C.F.R. § 404.1527(d). A treating doctor's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if supported by the medical findings and consistent with substantial evidence in the record. *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003); *see* 20 C.F.R. § 404.1527(d)(2). An ALJ may discount a treating doctor's medical opinion if, *inter alia,* a doctor's notes are internally inconsistent. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F3d. 500, 503 (7th Cir. 2004) (ALJ credited the opinions of specialists over the treating doctor's because the opinion was not consistent with his treatment notes). In sum, if an ALJ does not give the treating [doctor's] opinion controlling weight, he has to provide "good reasons" for how much weight he accords it. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir.2010); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir.2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir.2007). It is only required that the ALJ "minimally articulate his reasons for crediting or rejecting evidence of disability." *Clifford*, 227 F.3d at 870. *See also supra* at 18. The same principle applies to the assessment of a treating physician's opinion. That is precisely what the ALJ did. She articulated her reasons for rejecting the "B criteria" assessment

provided by Dr. Blount, the principal reason being that it was unsupported by his own treatment notes. For example, although Dr. Blount's treatment notes consistently indicate that she reported no hallucinations or delusions, his MRFC reports she has "psychotic features." (R. 25).

The ALJ also found inconsistencies between the treatment notes, which consistently report Ms. Clifton's mood as okay, but the MRFC indicating she has a mood disturbance and blunt/flat/inappropriate affect. (R. 25).[3] Additionally, the ALJ considered Dr. Blount's treatment notes reporting denials of suicidal or homicidal ideation, and their inconsistency with the MRFC in which he reported that Ms. Clifton has suicidal ideation. (R. 25).

Nonetheless, the ALJ did not discount all of the evidence provided by Dr. Blount. She only discredited the evidence that was inconsistent with his treatment notes from March 2007 to May 2008, the mental evaluation by Dr. Gil, and the evaluation of the medical record by Drs. Henson and Rozenfeld. Moreover, the ALJ noted that Ms. Clifton testified that Dr. Blount told her point blank he didn't think she should get SSI. Apparently the ALJ credited this testimony. All this evidence provided sufficient reason to afford Dr. Blount's "B criteria" assessment little weight. *Similia*, 573 F3d. at 516-17.

## 2.
### The Challenges to the ALJ's Determination of her RFC

The second primary argument advanced by the plaintiff is that the ALJ erred in determining Ms. Clifton's residual functional capacity under SSR 96-8p. To support this claim plaintiff makes three arguments. First, Ms. Clifton argues that the ALJ failed to adequately address her issues of getting along with others. Second, Ms. Clifton argues that the ALJ, when asking the VE for her

---

[3] *See Kangail v. Barnhart*, 454 F.3d 627 (7th Cir.2006). Unlike *Kangail*, this is not a case of "good and bad days"because Dr. Blount's treatment notes *consistently* report her mood as "good" or "ok."

opinion on what jobs she could perform, failed to incorporate the claimant's moderate limitations in concentration, persistence, or pace into the hypothetical. Finally, Ms. Clifton argues that the ALJ failed to address the effects of Ms. Clifton's obesity on her ability to work.

First, the plaintiff argues that the ALJ did not fully account for Ms. Clifton's difficulty in getting along with others. Plaintiff begins by noting that Ms. Clifton attempted three jobs, all of which were lost due to altercations with customers. (*Memorandum in Support of Plaintiff's Motion for Summary Judgment*, at 13). However, the record shows that this claim is in dispute and the ALJ considered the inconsistencies. (R. 25). Ms. Clifton claims she lost her job at the roller skating rink because she had an altercation (R. 39), but her mother testified it was due to a pregnancy. (R. 83-84). Thus, looking at her limited work history, it is not clear that it has been unsuccessful due to difficulty in getting along with others. Additionally, the ALJ relied, in part, on the treatment notes of Dr. Blount showing that after finding the correct mix of medications, Ms. Clifton was able to control her anger. (R. 25). Thus, the ALJ did adequately address Ms. Clifton's issue of not getting along with others by reviewing her work history and relying on Dr. Blount's treatment notes showing that her symptoms can be controlled with the proper medications. (R. 25).

Second, the plaintiff argues that the ALJ committed reversible error in evaluating the claimant's residual functional capacity by not explicitly instructing the VE to consider the ALJ's finding of moderate difficulties in concentration, persistence and pace. In support of this argument, plaintiff points to *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir.2010). In *O'Connor-Spinner*, the court held that in the context of that case "is not clear whether the hypothetical [provided by the ALJ] . . . would cause the VE to eliminate positions that would pose significant barriers to someone with the applicant's depression-related problems . . . ." *Id.* at 620.

However, the Seventh Circuit stressed that "[w]e [have not insisted...on a per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases. We sometimes have assumed a VE's familiarity with a claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations." *Id.* at 619. The opinion made clear that a court can uphold a decision where the ALJ provides a hypothetical with "a description that exclude[s] positions likely to trigger symptoms of [the disorder] that lay at the root of the claimant's moderate limitations . . . ." *Id.*

The court noted that it has approved an ALJ's hypothetical even though it omitted the terms "concentration, persistence and pace" when it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform. For instance, *Johansen v. Barnhart*, 314 F.3d 283 (7th Cir.2002) let stand a hypothetical formulated in terms of "repetitive, low-stress" work, a description that excluded positions likely to trigger symptoms of the panic disorder that lay at the root of the claimant's moderate limitations on concentration, persistence and pace. *Id.* at 285, 288-89.

In the present case, the root of Ms. Clifton's moderate limitations is her difficulty managing personal relationships. When providing the VE with a hypothetical the ALJ described it as "[l]imited to simple, routine tasks limited, by that I mean up to one third of the day*, interaction with supervisors or co-workers, limited interaction with the public but that means not having to provide information or service directly to the public*." (R. 103)(emphasis supplied). The ALJ's alternative phrasing thus "excluded those tasks that someone with the claimant's limitations would be unable to perform." *O'Connor-Spinner*, 627 F.3d at 619. In addition, the VE was present during the hearing

and heard the testimony of the medical experts and Ms. Clifton. The VE was therefore aware of Ms. Clifton's moderate limitations in concentration, persistence, and pace. Limiting the hypothetical presented to the VE to less than one-third of the day interaction with others, was consistent with and emphasized the need to exclude positions that would trigger Ms. Clifton's symptoms.

When asked about any evidence of Ms. Clifton's past work history, the VE referred back to Ms. Clifton's testimony regarding her past work history. (R. 102). The VE also heard Dr. Rozenfeld testify that Ms. Clifton had "moderate [limitations] in concentration, persistence, and pace," (R. 97), and presumably accounted for it when giving her opinion. Therefore, the hypothetical provided by the ALJ and the fact that the VE heard testimony of Ms. Clifton's limitations were sufficient to cause the VE to take into account Ms. Clifton's moderate limitations in concentration, persistence, and pace.

Finally, plaintiff argues that the ALJ failed to account for Ms. Clifton's obesity in her residual functional capacity finding. It is the plaintiff's burden to show that her obesity limited her functioning or aggravated her mental impairments. *See Prochaska v. Barnhart*, 454 F.3d 731, 737 (7th Cir.2006). The plaintiff, however, did not make any claims that her obesity limited her capacity in any way. The ALJ did address the physical limitations of Ms. Clifton's weight and instructed the VE to consider her ability to carry objects greater than twenty pounds when giving her opinion on the type of work suitable to Ms. Clifton. (R. 104-05). Thus, the ALJ's decision did account for Ms. Clifton's obesity even though Ms. Clifton made no claims that it limited her functioning or aggravated her mental impairments.

**3.**
**The Challenges to the ALJ's Credibility Assessment**

Social Security hearings are not exempt from the basic axiom of experience that parties and witnesses will exaggerate when it is to their advantage. *Schmude v. Tricam Industries, Inc.,* 556 F.3d 624, 628 (7th Cir.2009); *Johnson v. Barnhart,* 449 F.3d 804, 805 (7th Cir.2006); *Brown v. Chater,* 87 F.3d 963, 965–66 (8th Cir.1996). Thus, the "administrative law judge did not have to believe [Ms. Clifton's tesstimony]." *Sarchet,* 78 F.3d at 307. Her subjective complaints were not required to be accepted insofar as they clashed with other, objective medical evidence in the record. *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir.2007). Indeed, discrepancies between objective medical or other evidence and self-reports may be evidence of symptom exaggeration. *Sienkiewicz v. Barnhart,* 409 F.3d 798, 804 (7th Cir.2005).

An administrative law judge's credibility determination is reviewed with "special deference," *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir.2010); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir.2005), because the ALJ, not a reviewing court, is in the best position to evaluate credibility, having had the opportunity to observe the claimant testifying. *Jones v. Astrue*, 623 F.3d 1155,1160 (7th Cir.2010). *Cf. Ashcraft v. Tennessee*, 322 U.S. 143, 171 (1944)(Jackson, J., dissenting)("A few minutes observation of the parties in the courtroom is more informing than reams of cold record."). The credibility determination need not be flawless, *Simila*, 573 F.3d at 517, and will be reversed only if is "patently wrong." *Jones*, 623 F.3d at 1162. That occurs only when the determination is "lack[ing] any explanation or support." *Id.* at 1160; *Simila*, 573 F.3d at 517. Demonstrating that a credibility determination is patently wrong is a "high burden." *Turner v. Astrue*, 390 Fed.Appx. 581, 587 (7th Cir.2010).

The first argument made on the credibility issue is that the ALJ erred when finding Ms. Clifton's "medically determinable impairments could reasonably be expected to cause the alleged

symptoms" but her "statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the . . . functional capacity assessment." Essentially, plaintiff argues that this language implies that ability to work was determined before the assessment of the claimant's abilities regarding "intensity, persistence, and limiting effects" and that this analysis is therefore logically backwards. In support of this argument, plaintiff cites *Bjornson v. Astrue*, 671 F.3d 640, 645-46 (7th Cir.2012).

The Seventh Circuit, noting its frequent use by ALJs in their decisions, has repeatedly criticized this template as "unhelpful," *Shauger v. Astrue,* 675 F.3d 690, 696–97 (7th Cir.2012), "opaque," *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012), and "meaningless," *Parker v. Astrue,* 597 F.3d 920, 921–22 (7th Cir.2010), and explained that it backwardly "implies that the ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson,* 671 F.3d at 645–46. More importantly, it fails to indicate which statements are not credible and yields no clue to what weight the ALJ gave a claimant's testimony. *See Spiva v. Astrue,* 628 F.3d 346 (7th Cir.2010); *Parker,* 597 F.3d 920. In short, this sort of boilerplate is inadequate, *by itself,* to support a credibility finding. *Richison v. Astrue,* 2012 WL 377674, *3 (7th Cir.2012). Conversely, its use by itself does not make a credibility determination invalid. Not supporting a credibility determination with explanation and evidence from the record does. *See Punzio v. Astrue,* 630 F.3d 704, 709 (7th Cir.2011); *Parker,* 597 F.3d at 921–22. If the ALJ's credibility finding was based solely on the formula to which the plaintiff rightly objects, a remand would be required. But as we shall see, *infra* at 26, *et seq.,* that is not all there is, notwithstanding the plaintiff's brief's narrow view of the ALJ's decision and its inaccurate portrayal of the ALJ's assessment of the evidence.

While *Bjornson* and other cases disapprove of the use of this language, it is only when "[s]uch boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." *Id.* at 645 (*citing Hardman v. Barnhart*, 362 F.3d 676, 679 (10th Cir.2004)).[4] In *Bjornson* the court objected in particular to the fact that the assessment of the claimant's residual functional capacity came "later in the [ALJ's] opinion, not 'above' . . . ." In contrast, the ALJ's decision here does not use the language in a mechanical fashion, but rather uses it *after* discussing the reasons for her decision.

For example, the ALJ notes, "a close look at Dr. Blount's treatment notes reveals that after some adjustment of her medication, her symptoms are controlled." (R. 25). Additionally, the ALJ noted discrepancies between the record and Ms. Clifton's statements including claims that she left school and was fired from her job at the skating rink because of altercations when her mother testified it was because she became pregnant. (R. 25). Furthermore, the ALJ found it inconsistent that Ms. Clifton reported to Dr. Buch she was bipolar when neither Dr. Blount nor Dr. Gil made that finding. (R. 25). Therefore, the ALJ did provide "meaningful . . . specific evidence [she] considered" in determining Ms. Clifton's credibility, and the "boilerplate" language came after the evidence.

Next, the plaintiff argues that the fact that Ms. Clifton can engage in daily activities such as cooking, cleaning, shopping and taking public transportation is not inconsistent with a finding that she cannot work due to the difficulties with personal relationships. But the ALJ did not base her decision solely on the performance of these activities. On the contrary, the ALJ concluded that Ms.

---

[4] This is but a specific application of the broader principle that there is no magic in words. "We must think things, not words, or at least we must constantly translate our words into facts for which they stand, if we are to keep to the real and the true." Holmes, *Law and Science and Science and Law*, 12 Harv.L.Rev. 443, 460 (1889).

Clifton "may have some issues with anger and depression," but she based her decision, in part, on Dr. Blount's treatment notes showing that these symptoms can be controlled. (R. 25). Therefore, plaintiff's argument on this point is unpersuasive.

Finally, the plaintiff argues that the ALJ erred in finding that Ms. Clifton "apparently overstated her symptoms and was not completely credible." (R. 25). Plaintiff argues that because Dr. Blount's July 25, 2008 MRFC includes symptoms not present in his treatment notes; Ms. Clifton likely underreported her symptoms. However, plaintiff incorrectly interprets the record. According to the record, the ALJ was not referring only to Ms. Clifton's reporting to Dr. Blount, but rather her reporting to Dr. Blount, Dr. Gil, Dr. Buch, and her administrative testimony as a whole. (R. 25). After stating that Ms. Clifton "was not completely credible," the ALJ goes on to list the evidence that led to that conclusion. (R. 25). She mentions plaintiff's claims that she lost her job at the roller skating rink and dropped out of school because of altercations and the inconsistencies with her mother's testimony that it was because she became pregnant. (R. 25). Then the ALJ discusses the claimant's self-reporting that she had few friends when the mother testified that she has had several boyfriends and goes away sometimes on the weekends. (R. 25). Regarding over reporting of medical symptoms, the ALJ notes that after leaving Dr. Blount plaintiff reported to Dr. Buch that she had bipolar disorder. (R. 25). Claimant also reported to Dr. Gil that she had early behavioral problems. (R.25). None of these claims were in the reports provided by Dr. Blount. (R. 25). Thus, the credibility determination by the ALJ was not "patently wrong," *Jones*, 623 F.3d at 1162, and it is entitled to "special deference." *Castile*, 617 F.3d at 929.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is DENIED, and the Commissioner's motion for summary judgment is GRANTED.

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

DATE: 6/18/2012